UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| SCOTT A. HOLMAN,<br><br>        **Plaintiff,**<br><br>v.<br><br>LAURI A. KETOLA, individually and in her official capacity as County Attorney for Carlton County; COUNTY OF CARLTON, MINNESOTA, a municipal corporation; KERRY E. KOLODGE, individually and in his official capacity as Cloquet City Council Member; and CITY OF CLOQUET, MINNESOTA, a municipal corporation,<br><br>        **Defendants.** | **CASE FILE NO.:**<br><br>**COMPLAINT**<br><br>**CIVIL ACTION - LAW**<br>**JURY TRIAL DEMANDED** |

**To:** Defendants above named and their respective attorneys. This is an action for damages brought pursuant to 42 U.S.C. §§ 1983, and various Amendments to the United States Constitution. The Plaintiff also brings Minnesota common law claims including defamation and intentional infliction of emotional distress.

## I.    INTRODUCTION; SUMMARY OF CONTENTS

1. This is a civil rights lawsuit seeking damages for the termination of Detective Sergeant Scott Holman (Plaintiff) by Defendant City of Cloquet.

2. Plaintiff's termination was commenced through the use of a so-called "Brady" policy created by the Carlton County Attorney's Office for sanctioning police officers.

3. Although City of Cloquet police officers have a right to due process before they can be disciplined or fired, like all Minnesota police officers, the Brady procedure was used to justify Plaintiff's termination without any due process at all. This was done deliberately by the Defendant County Attorney (Ketola) with the conspiratorial cooperation of the Defendant City Council Member (Kolodge). Both of these Defendants had a vendetta/personal motive to damage and violate the rights of Plaintiff as a United States citizen as delineated herein.

1

4. After Ketola's illegal conduct began, which included defamation and other tortious and retaliatory conduct, Kolodge, rather than protecting Plaintiff from what he knew or should have known was illegal conduct by Ketola, conspired with Ketola with the ultimate goal of terminating Plaintiff. Most of the Cloquet city council members and mayor, rather than protecting Plaintiff from the illegal conduct, cooperated with Kolodge, achieving the goal of termination.

5. In the Brady procedure, Ketola acting as the accuser, investigator, judge, jury, and creator of false, defamatory evidence and then branded Plaintiff untrustworthy to testify in court, knowing that this determination could result in discipline or termination, and intended that it do so. Plaintiff was not given fair notice of a charge, a fair opportunity to submit and respond to evidence, the right to an unbiased decision maker, or the right to appeal or review for the Brady label. The taint of Brady and the City's firing served the goal of destroying Holman's law enforcement career then and into the future. Carlton County's Brady policy violated Plaintiff's due process rights and should be declared unconstitutional under both state and federal law.

6. In addition to the Brady label, Ketola went the extra step beyond Brady and advised the Cloquet Police Department (CPD) chief that she would refuse to prosecute any cases that could rely on the testimony of Plaintiff enhancing the prospect of Plaintiff's termination and his inability to work as a licensed Minnesota peace officer anywhere, not just CPD. Plaintiff who needed the protection of City of Cloquet employees to keep his job due to Ketola's illegal conduct, received the opposite treatment with Kolodge as the City ring leader in essence destroying his career with the conspiratorial cooperation of Ketola resulting in the damages delineated herein. Even the Cloquet mayor assisted with the illegal termination process.

7. Because the Carlton County Brady procedure lacks due process protections and standards, it can be utilized to sanction officers for unfair and unlawful reasons. In Plaintiff's case, a substantial reason this sanction was imposed and resulted in his termination was his advocacy via social media posts for his agency and fellow officers. These matters concerned a former Cloquet police chief who both Defendants Ketola and Kolodge had developed a close personal friendship before their tortious conduct delineated herein – and were otherwise conflicted. Holman's posts additionally criticized both Ketola and Kolodge resulting in an additional personal vendetta by the two against Plaintiff which provided the motivation for their violation of his First Amendment rights and other tortious and retaliatory conduct.

## II. JURISDICTION AND VENUE

8. This Court has original and supplemental jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343, 1367, and 42 U.S.C. § 1983, as Plaintiff's claims are based on rights under the United States Constitution, state law, and common law. Claims under Minnesota law are also pursued by Plaintiff as noted herein.

9. Venue in this Court is appropriate since the unlawful practices delineated herein occurred within Minnesota and this federal district.

## III.   PARTIES

10. Plaintiff former Detective Sergeant Scott A. Holman is an adult individual who at all material times resided, and still resides, in Carlton County, Minnesota.

11. Defendant Lauri A. Ketola (Ketola)[1] is an adult individual (also resident of Carlton County) and County Attorney for Carlton County, Minnesota, at various relevant times herein. However, some of the tortious conduct delineated herein concerns her actions before she became a county attorney as a member of the Cloquet Citizen Advisory Board (CAB) for the CPD. Regardless, her conduct was within the scope and course of her employment for these two entities, and all of her actions or inactions were taken under color of state law. She is additionally sued in her individual capacity.

12. Defendant County of Carlton (Carlton County), Minnesota, a municipal corporation, is located at 31 Walnut Avenue, Carlton, Minnesota. Defendant County operates and supervises the Office of the Carlton County Attorney (CCA) and as such has supervisory authority over Defendant Ketola.

13. Defendant Kerry E. Kolodge (Kolodge) is an adult individual and member of the Cloquet City Council (CCC), at all relevant times herein. All of his actions and inactions were taken under color of state law. His conduct was within the scope and course of his duties as a member of the Council, and as such, the City of Cloquet is vicariously liable for his conduct. He is additionally sued in his individual capacity.

14. Defendant City of Cloquet, Minnesota (Cloquet), a municipal corporation, is located at 101 14th Street, Cloquet, Minnesota. Defendant Cloquet operates and has supervising authority over the

---

[1] After initial introduction, persons in this Complaint will generally be referenced by last name except Holman who will be noted as "Plaintiff" throughout.

members of the CCC.

## IV.     FACTUAL BACKGROUND

**A.  Plaintiff and Former CPD Chief, Steve Stracek**

15.  Plaintiff became a licensed Minnesota peace officer in 1997 and began and completed his over 22-year career in law enforcement, before his June, 2019 termination by City of Cloquet, with the Cloquet Police Department (CPD).

16.  Throughout his career with CPD, Plaintiff was promoted and given supervisory roles with the rank of Detective Sergeant at time of termination.  He was certified as a K-9 handler early in his career and became known within his agency, and other agencies, both state and federal, as an investigative star in the War on Drugs.

17.  Plaintiff's hard work resulted in numerous commendations and awards.  This was especially true with his many-year success with his K-9 partners and expertise with drug investigations.

18.  As part of his work with drug task forces, Plaintiff came to know a Duluth Police Department (DPD) officer named Steve Stracek.  Stracek supervised Plaintiff through a Northeast Minnesota drug task force and had achieved the rank of lieutenant in DPD.

19.  At Plaintiff's recommendation in 2014, Stracek applied for the position of chief with CPD due to the fact that CPD's chief retired.  Plaintiff assisted Stracek with the application process and supported Stracek's process to become chief.  Stracek became chief in August of 2014.

**B.  Stracek's Demise with CPD**

20.  As time went on, the rank-and-file CPD officers became disillusioned with Stracek due in part to his management style.  Stracek was advised of these concerns but did not change.

21.  In March of 2017, CPD's union, Teamster Local 346, interceded and eventually had a vote regarding Stracek which was later labeled as "no-confidence."  Only one officer of the rank-and-file force supported Stracek with the vote.

22.  CCC could terminate or retain Stracek.  It was clear the majority of the Council did not support

Stracek's retention.  Stracek resigned in June of 2017 with a separation agreement.[2]

C. **Defendants Ketola and Kolodge; Cloquet Citizen Advisory Board (CAB); Cloquet Citizens United (CCU)**

23.   Defendant Ketola became an attorney in 1993 and a member of the Cloquet Citizen Advisory Board (CAB), an oversight entity for CPD, in 2008.  CAB's duties were to assist the chief with matters such as discipline procedures, public complaints, and hiring from a community perspective.

24.   As a member of CAB, one of three, it was important for Ketola to maintain her objectivity and not put herself in a position of conflict concerning CPD personnel including the chief.  She was a member of CAB during the time frame of Stracek's tenure as chief.

25.   Defendant Kolodge is a former officer with DPD and former field partner of Stracek with DPD.  He became a member of CCC in 2013 and, as such, he was a member of CCC when Stracek resigned in 2017.  He is still a member.

26.   Although the full extent of Ketola's relationship with Stracek may not be known, it is clear that both her and Kolodge were close friends and allies of Stracek before, during, and after his tenure as CPD chief.

27.   Cloquet Citizens United (CCU) was a consortium of Cloquet religion-based citizens which entity began after Stracek's resignation whose primary existence was to address the circumstances and facts that led up to Stracek's resignation.

28.   CCU members, before and after its formal creation, with the assistance of Ketola and Kolodge, began a campaign of support for Stracek that included a candlelight vigil in April of 2017, meetings for strategy, manipulation of local media to get their message across, and the utilization of social media communications.  These events were particularly active after the no-confidence vote in March of 2017 up to Stracek's resignation in June of 2017.

D. **Plaintiff's Posts of June of 2017 and Stracek's July 24, 2017 Complaint**

29.   After the no-confidence vote became public, CPD was disparaged repeatedly with public comments, the strange candlelight vigil in April of 2017 (in which Ketola participated), social media

---

[2] He is currently a police officer with DPD.

5

posts, and newspaper stories in a local newspaper. From Plaintiff's perspective, this was essentially daily, unfair, untruthful criticism of his agency with no objectivity and pro-Stracek.

30. After Ketola publicly attended the vigil event, violating the common sense approach for CAB members to be objective, a public relations problem developed with her and CPD. She spoke with CPD members in June of 2017 and opined that she would be objective, an impartial member of CAB, and had no allegiance or friendship with Steve Stracek.

31. Around that same time on June 8, 2017, Stracek sent Ketola a Facebook post which said: "Happy Birthday my friend. You are awesome! Enjoy this beautiful day." A smile emoji was placed after the last word. This was two days after Stracek had resigned and was after Ketola had addressed CPD as noted in paragraph 30. It was clear to the CPD chief and other CPD members that Ketola had not been truthful to their members about her relationship with Stracek.

32. Plaintiff, frustrated with what he felt was unfair treatment of his agency, with use of a pseudonym, posted on social media, primarily directed to CCU members, his contention that the media had not been objective regarding the Stracek matter and other topics such as Stracek's prior membership in the disbanded and discredited Minnesota Gang Strike Force aka Metro Gang Strike Force.[3] Plaintiff's goal was to have the public and the press look at the Stracek situation more objectively.

33. Of note is the fact that Plaintiff named Ketola and Kolodge in posts and referred to Ketola's "agenda" and his contention/belief that Kolodge had changed the educational requirements to allow his long time friend and partner Stracek to be hired for the CPD chief's job. By "agenda", he was referring to Ketola's obvious bias for Stracek.

34. Plaintiff's June of 2017 posts were in the category of protected speech for a public employee, and they represented an exercise of his First Amendment rights under the United States. and Minnesota Constitutions. Both Defendants Carlton County and City of Cloquet, it is reasonably believed, never competently trained or advised those persons under their supervision of those important citizen rights and the ramifications for ignoring them.

35. On July 24, 2017, former chief Stracek filed a "citizen complaint" against Plaintiff alleging that

---

[3] It was determined in 2009 that this entity had violated the civil rights of hundreds of Minnesotans.

Holman's posts were "disparaging and false" and violated "Cloquet Police Department policies and possibly state statutes." It was clear Stracek had access to all of the posts. None had been deleted or otherwise were not accessible to him. Based on reasonable information and belief, Plaintiff contends that Ketola assisted Stracek with preparation of the Holman complaint.

36. A commander in CPD began an investigation pursuant to CPD policy. When questioned about the posts, Plaintiff admitted they were his posts, advised that he did not know that what he did violated CPD policy, made clear he had deactivated the account but had not deleted anything (to this day all of the posts can be easily retrieved), made clear he would provide the password to access the account, and he would not engage in conduct like that in the future.

37. The commander completed his investigation in the Fall of 2017 concluding that the posts did violate agency policy, but he additionally concluded that many of the allegations were not supported. The report was submitted to Chief Jeffrey Palmer. With input from City officials and the advice of counsel, Palmer planned to assess the minor discipline of oral reprimand but first conveyed the proposed disposition to CAB for their input. The City was warned by counsel that discipline for Plaintiff could be problematic in the sense that Plaintiff's speech via the posts was protected speech.

### E.  The CAB Meetings of 1/17/18 and 1/29/18 Regarding the Stracek/Holman Matter

38. City officials and Chief Palmer had a closed session meeting with the CAB members on January 17, 2018 to advise of the proposed discipline of the oral reprimand. CPD had a four-tier system with this form being the most minor. In some sense it was viewed as like coaching to ensure the employee knew this conduct was a violation and would not repeat the conduct.

39. Ketola, who admitted she had been named in the posts, and was therefore clearly in a conflict position and should have removed herself from the process, advocated for the more significant discipline of suspension.[4]

40. During the meeting, she made various allegations listed below that were heard by all present:

   a. Plaintiff "tampered" with evidence;
   b. Plaintiff "got rid of" evidence before the investigation began;
   c. But for the deletion/tampering of evidence, the conduct could have risen to the level of a crime; and

---

[4] A recording exists of this meeting.

  d. The conduct in question was performed while the officer was on duty.

 These statements were all false and otherwise defamatory. Although the officer was not named as part of the process, Ketola clearly knew from Stracek that the subject was Plaintiff.

 41. Ketola was told repeatedly the above statements were false, but throughout the entire process, she failed to retract them.

 42. Another meeting was scheduled for January 29, 2018 with the same attendees. Ketola repeated her defamatory comments from the prior meeting. She either intentionally or unintentionally failed to comprehend the difference between deleted posts versus a deactivated account. Commander Ferrell's investigation supported Plaintiff in the sense that Ketola had uttered defamatory statements about Plaintiff. Ketola refused to deviate even though she should have known as a lawyer that conduct of this type could subject her to civil liability including the fact that she knew or should have known that the post activity of Holman regarding the Stracek matter was First Amendment protected speech of a public employee.

 43. Based on reasonable information and belief, the City's private attorney warned Cloquet personnel that sanctioning Plaintiff for these posts could violate Plaintiff's constitutional rights. Ketola knew of this advice, intentionally chose to ignore it, and engaged in retaliation coupled with the defamation. Her goal, even at this early stage, was to suspend Plaintiff and with her influence, terminate Plaintiff. She had just begun the process and had no intention of giving up. In the 1/17/18 meeting, City Administrator Reeves told Ketola now was her time to present an argument as to why suspension was appropriate for the Holman/Stracek matter. She said: "I'm getting there."

**F. The CAB Appeal of 2/10/18**

 44. Rather than retracting her false statements, removing herself from the process due to conflict, and agreeing with the notion that oral reprimand was a reasonable, minor sanction for Holman's posts, Ketola drafted an appeal on behalf of CAB to be presented to CCC advocating for the sanction of suspension for Holman.

 45. Ketola repeated her defamatory comments in a multiple-page document. CCC and the mayor, in a 5-2 vote, supported the motion to deny the appeal. Kolodge, who like Ketola, had a conflict of interest, refused to remove himself from the process and not surprisingly, opposed the motion to deny

the CAB appeal.[5]  Kolodge clearly wanted Plaintiff suspended motivated by the fact that Plaintiff had criticized Kolodge in the posts.

### G.  The Election of November, 2018; Ketola becomes District Attorney of Carlton County

46.  After Ketola's failed attempts to increase the sanction for Holman regarding the Stracek complaint, CCC decided not to reinstate Ketola to CAB in April of 2018.  This fact increased Ketola's anger and desire for retaliation against Plaintiff, and in essence, blamed Holman for her demise with CAB.  Kolodge opposed the decision to remove Ketola, and the fact that his desire was rebuked also increased his anger for retaliation against Plaintiff.

47.  In 2018, Ketola decided to run for district attorney of Carlton County.  She had a built-in advantage with name recognition in the sense that her father-in-law had been a long-time incumbent in that position years before.  If elected, the position had the extra incentive for her to continue her retaliation and other illegal conduct regarding Plaintiff.  And she knew she had an ally on the CCC – Kolodge – who could assist with her goal of terminating Plaintiff and otherwise destroying Plaintiff's career as a Minnesota peace officer.

### H.  Ketola's Brady Plan

48.  After being duly elected in November of 2018, Ketola's four-year term began in early January, 2019.  On February 22, 2019, at 4:06pm, Ketola called Chief Palmer and advised of her decision to label Plaintiff as a Brady officer.  She additionally told Palmer she would not charge/prosecute any case that involved Plaintiff as a detective or investigator.  Plaintiff was advised by an assistant county attorney for Carlton County that Ketola's phone call violated her employer's own Brady policy.

49.  Ketola, in a letter dated 2/25/19, advised Palmer of the Brady label citing three incidents she alleged supported "misconduct related to dishonesty and credibility" which, she alleged, resulted in disciplinary findings: 12/22/04; 1/3/05; and 7/24/17.  Ketola provided no detail for these allegations, but Palmer knew immediately that the 7/24/17 matter, which obviously concerned the Stracek posts, did not involve dishonesty or credibility.

50.  In addition to the unilateral Brady label, Ketola went beyond Brady and advised Palmer that she

---

[5] The other member who joined Kolodge was Roger Maki who became mayor and moved for and supported Holman's termination in June of 2019.  See Paragraph 6.

9

would not prosecute cases "that rely on the testimony of Detective Holman" with a letter dated March 14, 2019.  She additionally alleged "three separate instances of documented matters involving untruthfulness and/or credibility."  This additional position placed Plaintiff in a reality where maintaining his occupation would be difficult.

51. Based on reasonable information and belief, before the Brady label, Ketola had accessed Plaintiff's personnel file.  It was subsequently learned the file was not maintained accurately, due to the negligence of the Defendant City, and important facts were missing based on alleged prior discipline.

52. In an effort by CPD to set the record straight, Commander Carey Ferrell, who had investigated the Stracek complaint, noted that the alleged 2005 discipline cited by Ketola did not involve a missed court date in relation to consumption of alcohol.  The date was in fact a normal day off for Plaintiff confirmed by the county attorney at the time, Thom Pertler.

53. In a letter dated March 21, 2019, City Administrator Aaron Reeves detailed for Ketola the three items she noted that she claimed supported Brady for reconsideration of her decision to not prosecute cases in which Plaintiff could be a witness.

54. For the 12/22/04 matter regarding a cold weather shoot, the City did not find that Plaintiff had been dishonest.  Reeves amplified Ferrell's Memo regarding the 1/3/05 incident and that the notion that Holman had "lied" was not substantiated.

55. Regarding the 7/24/17 Stracek matter, facts of which Ketola was well aware, Reeves noted that Holman did not "delete" the relevant Facebook material but merely deactivated it.  He further opined Holman's complete cooperation with the investigation and other mitigating factors.  Reeves noted that the final disposition did not include anything discipline related regarding an alleged deletion of the account or any matter of dishonesty.

56. Ketola emailed Reeves on 3/27/19 and noted that she would not change her decision regarding Plaintiff as same pertained to his involvement in cases for which Ketola's office would contemplate prosecution.  Any reasonable county attorney, applying common sense and integrity, faced with these additional facts, would have changed their decision on prosecutions and in fact removed the Brady label.  In addition, due to her obvious conflict from the beginning, if Ketola's intent on Brady was legitimate, which it was not, she should have utilized an outside agency for the Brady policy as it pertained to Plaintiff.

57. With a letter dated April 10, 2019, Plaintiff's union advised Reeves of an official complaint concerning the incomplete personnel file for Plaintiff and how these discrepancies potentially led to the labeling of Plaintiff as "Brady Impaired."

## I. Defendant City's Reaction to Ketola's Decisions to Not Retract The Brady Label And Her Refusal to Prosecute Cases Which Could Involve Plaintiff as a Witness

58. With a letter dated April 2, 2019, Reeves advised Plaintiff that he was considering recommending to the City of Cloquet that he be dismissed from his employment with CPD.

59. On May 9, 2019, a local newspaper known as "Pine Journal", dubbed "Carlton County's Newspaper", ran a story, page 1, with caption: "Second CPD Cop's Court Testimony Called into Question." Plaintiff's picture appeared. This story exhibited an inherent, evil nature of Carlton County's Brady policy: once in place, public dissemination of all detail is inevitable, even if inaccurate (and Ketola knew it was inaccurate) through leaks and, for example, disclosure to criminal defense attorneys.

60. On June 4, 2019, CCC convened to address the issue of Plaintiff's employment as raised by the conspiratorial conduct of Ketola and Kolodge detailed herein. In a 4-2 vote, Plaintiff's employment with CPD/Cloquet was terminated. The conspirators, with the assistance directly and indirectly of the municipal Defendants, had finally achieved their goal.

## V.  CAUSES OF ACTION UNDER FEDERAL LAW

**Plaintiff v. Individual Defendants**
**Federal Claim 1:  First Amendment – Unlawful Retaliation for Exercise of Free Speech**
**(Pursuant to 42 U.S.C. §1983)**

61. Paragraphs 1-60 are stated herein by reference.

62. By the above-described acts, Defendants, jointly and severally, caused Plaintiff to be penalized for exercising his clearly established right to speak out and engage in activities on matters of public concern and importance, and to be denied his right to be free from retaliation in the form of adverse employment and governmental actions motivated by his exercise of such rights, as guaranteed under 42 U.S.C. §1983 and the First and Fourteenth Amendments to the United States Constitution.

63. The Individual Defendants are not entitled to qualified immunity for their actions with this

Claim and all others detailed in this complaint.

64. The Individual Defendants' unlawful conduct proximately caused Plaintiff to suffer emotional distress, embarrassment, humiliation, public scorn, permanent loss of reputation, financial injury, loss of income and earning capacity, and to incur attorneys' fees and other costs associated with the commencement of this lawsuit.

65. The Individual Defendants, as a result of their outrageous behavior, engaged in intentionally or recklessly, are liable to Plaintiff for the aforementioned injuries and damages, as well as punitive damages, with total damages suffered well exceeding $4,000,000, to be further determined at trial.

66. Punitive damages are also properly awardable against the Individual Defendants and are hereby claimed as a matter of federal common law, Smith v. Wade, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. §549.20.

**Plaintiff v. Individual Defendants**
**Federal Claim 2:  Unconstitutional Deprivation of Liberty and Property Without Due Process (Pursuant to 42 U.S.C. §1983)**

67. Paragraphs 15-60 are stated herein by reference.

68. By the above-described acts, all the Defendants caused Plaintiff to be denied liberty and property without due process of law, violating the clearly established rights generated under the due process clauses of the United States Constitution, The Fifth and Fourteenth Amendments, and 42 U.S.C. §1983.

69. The Individual Defendants are not entitled to qualified immunity for their actions.

70. The Individual Defendants' unlawful conduct proximately caused Plaintiff to suffer emotional distress, embarrassment, humiliation, public scorn, permanent loss of reputation, financial injury, loss of income and earning capacity, and to incur attorneys' fees and other costs associated with the commencement of this lawsuit.

71. The Individual Defendants, as a result of their outrageous behavior, engaged in intentionally or recklessly, are liable to Plaintiff for the aforementioned injuries and damages, as well as punitive damages, with total damages suffered well exceeding $4,000,000, to be further determined at trial.

72. Punitive damages are also properly awardable against the Individual Defendants and are hereby

claimed as a matter of federal common law, <u>Smith v. Wade</u>, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. §549.20.

**Plaintiff v. Defendant County of Carlton and Defendant Ketola**
**Federal Claim 3: Carlton County's Brady Policy**
**(The Fifth and Fourteenth Amendments)**

73. Paragraphs 15-60 are stated herein by reference.

74. Carlton County's Brady policy as applied to Plaintiff by Defendant Ketola is unconstitutional and deprived Plaintiff of his due process rights pursuant to the Fifth and Fourteenth Amendments of the U.S. Constitution.

75. Defendants Carlton County and Ketola's conduct proximately caused Plaintiff to suffer emotional distress, embarrassment, humiliation, public scorn, permanent loss of reputation, financial injury, loss of income and earning capacity, to incur attorneys' fees and other costs associated with the commencement of this lawsuit.

76. Defendants Carlton County and Ketola, as a result of application of the Brady policy, is liable to Plaintiff for the aforementioned injuries and damages, with total damages suffered well exceeding $4,000,000 to be further determined at trial.

**VI.   CAUSES OF ACTION UNDER STATE LAW**

**Plaintiff v. Defendant Ketola**
**State Claim 1: Defamation**
**(Pursuant to Minnesota State Law)**

77. Paragraphs 15-60 are stated herein by reference.

78. Defendant Ketola intentionally defamed Plaintiff as noted, for example, in Paragraphs 40 and 48-56.

79. Her statements were untruthful, defamatory on their face (defamation per se), and published. Even after being advised the statements were false, Ketola persisted with her defamatory conduct in her capacity with CAB and as Carlton County Attorney with her Brady activities.

80. Defendant Ketola's unlawful conduct proximately caused Plaintiff to suffer emotional distress, embarrassment, humiliation, public scorn, permanent loss of reputation, financial injury, loss of income

and earning capacity, and to incur attorneys' fees and other costs associated with the commencement of this lawsuit.

81. Defendant Ketola, as a result of her outrageous behavior, engaged in intentionally or recklessly, is liable to Plaintiff for the aforementioned injuries and damages, as well as punitive damages, with total damages suffered well exceeding $4,000,000, to be further determined at trial.

82. Punitive damages are also properly awardable against Defendant Ketola and are hereby claimed as a matter of federal common law, Smith v. Wade, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. §549.20.

**Plaintiff v. Defendants Ketola and Kolodge**
**State Claim 2:  Intentional Infliction of Emotional Distress**
**(Pursuant to Minnesota State Law)**

83. Paragraphs 15-60 are stated herein by reference.

84. The conduct of Defendants Ketola and Kolodge, mostly conspiratorial in nature with the specific design to illegally terminate Plaintiff and destroy his career, along with defamatory conduct by Ketola, constitutes intentional infliction of emotional distress, as that legal concept is defined under Minnesota law.

85. Defendants Ketola and Kolodge's unlawful conduct proximately caused Plaintiff to suffer emotional distress, embarrassment, humiliation, public scorn, permanent loss of reputation, financial injury, loss of income and earning capacity, to incur attorneys' fees and other costs associated with the commencement of this lawsuit.

86. Defendants Ketola and Kolodge, as a result of their outrageous behavior, engaged in intentionally or recklessly, are liable to Plaintiff for the aforementioned injuries and damages, as well as punitive damages, with total damages suffered well exceeding $4,000,000, to be further determined at trial.

87. Punitive damages are also properly awardable against Defendants Ketola and Kolodge and are claimed as a matter of federal common law, Smith v. Wade, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. §549.20.

**Plaintiff v. Defendants Carlton County and City of Cloquet**
**State Claim 3:  Negligent Training and Supervision**

**(Pursuant to Minnesota State Law)**

88. Paragraphs 15-60 are stated herein by reference.

89. The municipality Defendants were negligent for their failure to properly train and supervise those under their control regarding the constitutional rights of citizens, especially those in the category of public employees, like Plaintiff.

90. For Carlton County, this negligence was very possible for Defendant Ketola who had the potential as a new county attorney, especially with her history with CAB of strange conduct regarding a former chief and Plaintiff, of engaging in retaliatory conduct that could cause liability to Carlton County, and therefore, its taxpaying citizens, via vicarious liability. In short, County officials should have been on high alert[6] for the potential of someone who could be a loose cannon – which is exactly what occurred due to its lack of oversight.

91. For City of Cloquet, closer supervision, was certainly needed for Kolodge due to his conflict status with the Stracek/Plaintiff matter, but based on reasonable information and belief, no City official, or fellow Council member, competently addressed these issues with him to get him to back off when it came to Plaintiff or otherwise remove himself from the process due to his obvious conflict. Kolodge therefore, inserted himself as an active player throughout the entire process that led to termination and therefore damages for Plaintiff.

92. For this State Claim 3, Plaintiff requests damages as previously delineated herein.

**Plaintiff v. Defendant City of Cloquet**
**State Claim 4:  Negligent Maintenance of Employee Personnel File**
**(Pursuant to Minnesota State Law)**

93. Paragraphs 15-60 are stated herein by reference.

94. City of Cloquet did not competently maintain Plaintiff's personnel file regarding prior alleged discipline such that the content of same did not depict correct facts when viewed by an outsider. This assisted Ketola with her improper Brady process.

95. City of Cloquet personnel are vicariously liable to Plaintiff for this negligence, and for this

---

[6] Based on reasonable information and belief, Plaintiff dontends that Carlton County Commissioners were aware of Ketola's Brady plans before she commenced with those plans.

Claim 4, Plaintiff requests damages as previously delineated.

## VII. PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff requests that this Court enter a judgment in his favor and against Defendants as follows:

A. An Order granting Plaintiff joint and several judgments against Defendants;

B. An Order granting Plaintiff compensatory damages in such amount as a jury may determine but not less than $2,000,000 dollars;

C. An Order granting Plaintiffs punitive damages in such amount as a jury may determine but not less than $2,000,000 dollars.

D. An Order for Defendants to pay Plaintiff his costs, interest, and attorneys' fees; and

E. An Order for Defendants to pay any and all further relief available such as any relief this Court may consider equitable or appropriate.

**PLAINTIFF DEMANDS A JURY TRIAL.**

                                                **PADDEN LAW FIRM, PLLC**

Dated: January 15, 2020                By:/s/Michael B. Padden
                                                   Michael B. Padden, #177519
                                                   8673 Eagle Point Boulevard
                                                   Lake Elmo, MN 55042-8628
                                                   Phone: (651) 789-6545
                                                   Fax: (651) 433-7123
                                                   Email: mike.padden@paddenlaw.com
                                                  ***Lead Counsel for Plaintiff***

                                                   **APPLEBAUM LAW FIRM**
                                                   Paul Applebaum
                                                   Applebaum Law Firm
                                                   First National Bank Building Management
                                                   332 Minnesota Street
                                                   St. Paul, MN 55101
                                                   Phone: (651) 222-2999
                                                   Email: Paul@applebaumlawfirm.com
                                                   ***Counsel for Plaintiff***