UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

SCOTT A. HOLMAN,                                    Case No. 20-CV-0224 (PJS/LIB)

        Plaintiff,

v.

COUNTY OF CARLTON, MINNESOTA,
a municipal corporation; LAURI A.                              ORDER
KETOLA, individually and in her official
capacity as County Attorney of Carlton
County; CITY OF CLOQUET,
MINNESOTA, a municipal corporation;
and KERRY E. KOLODGE, individually
and in his official capacity as Cloquet
City Council Member,

        Defendants.

---

    Michael B. Padden, PADDEN LAW FIRM, PLLC, and Paul Applebaum,
APPLEBAUM LAW FIRM, for plaintiff.

    Jessica E. Schwie and Michelle A. Christy, KENNEDY & GRAVEN,
CHARTERED, for defendants Lauri A. Ketola, City of Cloquet, Minnesota,
and Kerry E. Kolodge.

    For more than 20 years, plaintiff Scott Holman was employed as a police officer

by the City of Cloquet (the "City"), which is located in Carlton County, Minnesota (the

"County"). In June 2017, Holman decided to insert himself into a local political battle,

and in doing so he made an enemy of defendant Lauri Ketola. Unfortunately for

Holman, Ketola was later elected Carlton County Attorney. In February 2019, Ketola

designated Holman as a "*Brady* officer"[1] and announced that she would not prosecute any cases that relied on his testimony. Ketola's decision obviously severely limited Holman's usefulness as a police officer. The City tried to persuade Ketola to change her mind, but, when she refused, the City fired Holman, and that firing was later upheld by an arbitrator. Holman then brought this lawsuit against Ketola, the County, Kerry Kolodge (a member of the Cloquet City Council at the time Holman was terminated), and the City to challenge his termination, alleging violations of both federal and Minnesota law.

In June 2020, the Court granted defendants' motion to dismiss all of Holman's claims against the County and against Ketola in her capacity as Carlton County Attorney, finding that those claims were clearly barred by the doctrine of prosecutorial immunity. *See* ECF No. 24. The matter is now before the Court on defendants' motion for summary judgment on the remaining claims. For the reasons that follow, the Court grants defendants' motion as to Holman's federal claims and dismisses those claims

---

[1]Under *Brady v. Maryland*, 373 U.S. 83 (1963), the government must disclose to the defendant in a criminal case any exculpatory evidence in the government's possession. The Supreme Court later extended *Brady*'s disclosure requirement to any evidence that could be used to impeach a prosecution witness, such as evidence that the witness has acted dishonestly. *Giglio v. United States*, 405 U.S. 150 (1972). A "*Brady* officer" is an officer who, in the opinion of a prosecutor, has committed dishonest acts that must be disclosed to criminal defendants if the officer is called to testify.

with prejudice.  The Court declines to exercise supplemental jurisdiction over Holman's

state-law claims and dismisses those claims without prejudice.

## I.  BACKGROUND[2]

Holman worked as a police officer for the City from 1997 until he was terminated

in June 2019.  ECF No. 53-1 at 73; ECF No. 1 ¶ 16.[3]  In June 2017, Holman inserted

himself into a "political firestorm" related to the resignation of former Cloquet police

chief Steve Stracek.  ECF No. 57 at 5; ECF No. 60-3 at 14–16 (deposition of former

Cloquet police officer and mayor David Hallback describing fallout from Stracek's

resignation).  Specifically, Holman used a pseudonym to post critical and inflammatory

comments about Stracek on Facebook.  ECF No. 13-1 at 17–18 (investigation report of

Commander Carey Ferrell, describing posts).  In response to those posts, Stracek (who

_____

[2]The Court cites to the record where it is possible to do so.  Unfortunately, however, it is not always possible to do so, because the attorneys did a poor job of submitting the record to the Court.  Due to the scattered nature of the parties' briefs, exhibits, and citations—and due to the unwieldy nature of some of the exhibits submitted by the parties—the Court relies at times on the pleadings to provide context.

The Court asks the attorneys to review the practice pointers and preferences available at https://www.mnd.uscourts.gov/sites/mnd/files/PJS.pdf.  The Court also advises the attorneys that combining multiple lengthy exhibits into one giant exhibit on ECF makes it extremely difficult for the Court to review the record, especially when (as here) citations to the record are not clear (because they lack page numbers that correspond to the filed ECF documents).

[3]Page numbers in record citations refer to the pagination in the computer-generated banner superimposed on items docketed in ECF, not to any document's internal pagination.

wasn't fooled by the pseudonym) filed a citizen complaint against Holman with the

Cloquet Police Department.  ECF No. 57 at 5–6; ECF No. 60-12 (Stracek's July 24, 2017,

complaint).  The department completed an internal investigation, concluded that

Holman had violated the department's social-media policy by posting false information

online, and decided that Holman's punishment should consist of an oral reprimand.

ECF No. 13-1 at 31 (Commander Ferrell report); ECF No. 60-4 at 4 (Holman deposition);

ECF No. 60-8 at 8–9 (deposition of former Cloquet police chief Jeff Palmer).

In January 2018, the Cloquet Citizen Advisory Board ("CAB")—which, at the

time, included Ketola—met with City officials to express its belief that Holman should

face more significant punishment for his Facebook posts.  ECF No. 57 at 7; ECF No. 60-

15 (memorandum from City's attorney to CAB); ECF No. 60-10 (audio recording of

January 29, 2018, meeting between CAB and City officials).  Ketola specifically

expressed concern that Holman had deleted[4] the Facebook account that he had used to

post the comments about Stracek.  ECF No. 60-10.  Ketola alleged that Holman's

deletion of the account was an attempt to interfere with the police department's

investigation into his misconduct.

---

[4]Holman dedicates pages of his brief to arguing that he did not "delete" the
Facebook account but merely "deactivated" it.  *See* ECF No. 57 at 8–12.  That dispute is
irrelevant to the legal issues before the Court, however, and thus the Court does not
address it further.

After City administrators decided not to increase Holman's punishment, CAB formally appealed the police department's decision to the Cloquet City Council ("Council"). ECF No. 60-16 (February 10, 2018, appeal from CAB to Council). CAB specifically requested that Holman "receive discipline that involves time off without pay." *Id.* at 8. On March 6, 2018, the Council voted 5 to 2 to deny CAB's appeal. ECF No. 53-1 at 1130 (March 6, 2018, Council meeting minutes).

Ketola completed her service with CAB and was elected as Carlton County Attorney in November 2018. ECF No. 1 ¶¶ 46–48. Shortly after taking office, Ketola informed police chief Jeff Palmer (Stracek's successor) that the County Attorney's Office had investigated Holman and uncovered evidence of misconduct that would be subject to disclosure under *Brady*. ECF No. 13-1 at 32–33 (February 25, 2019, letter from Ketola to Chief Palmer). One of several instances of misconduct cited by Ketola was Holman's Facebook posts from 2017. *Id.* Ketola later followed up with Chief Palmer to inform him that she did "not intend to prosecute cases that rely on the testimony of Detective Holman." *Id.* at 37–38 (March 14, 2019, letter from Ketola to Chief Palmer).

Ketola's decision put the City in a bind, as Cloquet is a small town that did not have the luxury of keeping on its payroll a full-time detective whose cases the County Attorney would not prosecute. City Administrator Aaron Reeves tried to persuade Ketola to change her mind. He responded to Ketola's letters to "clarif[y] certain

information . . . referenced . . . in [her] 'Brady/Giglio Data Sheet[s]' enclosed with [her] letter of February 25, 2019." *Id.* at 39–42 (March 21, 2019, letter from Reeves to Ketola). In essence, he explained that Ketola had misunderstood or mischaracterized Holman's alleged misconduct, and he asked that Ketola "consider this information in determining whether to prosecute cases in which Detective/Sergeant Holman will be a witness and reconsider [her] determination." *Id.* at 39. Ketola responded that she had "made [her] decision and will not be changing it." *Id.* at 53 (March 27, 2019, email from Ketola to Reeves).

After failing to persuade Ketola to change her mind, Reeves provided written notice to Holman that Reeves was considering recommending to the Cloquet City Council that Holman be terminated. ECF No. 13-2 at 14–17 (April 2, 2019, letter from Reeves to Holman). Reeves explained that Ketola had labeled Holman as a *Brady* officer and announced that she would not prosecute his cases, that Reeves and Chief Palmer had discussed the matter with Ketola, and that Ketola would not change her mind. Reeves also explained that as a result of Holman's designation as a *Brady* officer:

> [P]rosecutors will not pursue otherwise appropriate criminal charges against defendants if [Holman] is involved as a City law enforcement officer in the underlying incident because Detective/Sergeant Holman's involvement in a law enforcement response jeopardizes the success of any prosecution arising from that law enforcement response. . . .

The City police department's reputation and ability to
perform its law enforcement functions is substantially
impaired.

Supervisors, co-workers, and subordinates have [lost] or are
likely expected to lose trust in Detective/Sergeant Holman's
ability to perform his law enforcement and supervisory
duties and responsibilities[.]  [And]

The City is unable to allow Detective/Sergeant Holman to
perform the primary duties and responsibilities of his job as
a Detective Sergeant.

*Id.* at 16.  Reeves invited Holman and a representative to meet with him in person to

"respond to the contents of this letter" and also invited Holman to submit a written

response.  *Id.*

On May 23, 2019, Reeves wrote to Holman a second time to notify Holman that

he would recommend that Holman be "dismissed from employment."  ECF No. 53-1 at

1132.  Reeves invited Holman, along with any representatives he desired, to attend the

June 4, 2019, Cloquet City Council meeting at which the Council would vote on whether

to accept Reeves' recommendation.

At the June 4 meeting, Holman appeared with two attorneys: one representing

his union, and one representing Holman.  Both attorneys argued to the Council that

Holman should not be terminated.  ECF No. 54 (transcript of June 4, 2019, closed

Council session discussing Holman's termination).  After deliberating, the Council

voted to terminate Holman.  Reeves formally notified Holman of his termination and

told Holman the following:  "The basis for [the Council's] decision is outlined in my

April 2, 2019 letter to you.  An essential function of your position is testifying in court

and you are no longer able to do so."  ECF No. 53-1 at 1133.

Holman immediately filed a grievance challenging his termination.  ECF No. 13-2

at 1.  The arbitrator held a hearing on September 12, 2019, and upheld the City's

decision on November 7, 2019.  *Id.*  The arbitrator determined that the City was

powerless to change Ketola's *Brady* designation; that as a result of the designation,

Holman was unable to perform an essential duty of his position (testifying in court);

and that the City did not have the resources to continue to employ Holman if he could

not perform an essential duty of his job.  *Id.* at 11–12.  After losing in arbitration,

Holman filed this lawsuit.  ECF No. 1.

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution

might affect the outcome of the suit under the governing substantive law.  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Where the record taken as a whole could

not lead a rational trier of fact to find for the non-moving party, there is no genuine

issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation omitted).

### B.  First Amendment Retaliation

Holman first alleges that defendants retaliated against him for exercising his First Amendment right to post critical comments on Facebook about former police chief Stracek.  In order to prevail on a First Amendment retaliation claim, Holman must show "(1) that he engaged in a constitutionally protected activity; (2) that [defendants] took adverse action against him that would chill a person of ordinary firmness from continuing in the activity; and (3) that the adverse action was motivated in part by [Holman's] exercise of his constitutional rights." *Scheffler v. Molin*, 743 F.3d 619, 621 (8th Cir. 2014).

Holman argues that he was engaged in activity protected by the First Amendment when he used a false name to post criticisms of Stracek on Facebook.  *Cf. Higbee v. E. Michigan Univ.*, 399 F. Supp. 3d 694, 704 (E.D. Mich. 2019) (finding professor's Facebook post on topic of university's policies was constitutionally protected activity), *case dismissed*, No. 19-1751, 2019 WL 5079254 (6th Cir. Aug. 7, 2019). Holman further alleges that he suffered three adverse actions in retaliation for his Facebook posts:  (1) the police department investigated Stracek's complaint; (2) the

County investigated whether *Brady* required disclosure of prior misconduct by Holman; and (3) the City fired him.

The problem for Holman is that—even assuming that the First Amendment protected his Facebook posts—none of the actions that he cites gives rise to a viable retaliation claim:

*First*, the police department's internal investigation into Stracek's complaint is not an adverse action. To recover on a retaliation claim against his employer, Holman must show that the police department's investigation caused him to suffer "a tangible change in working conditions that produce[d] a material employment disadvantage." *Charleston v. McCarthy*, 926 F.3d 982, 989 (8th Cir. 2019) (quoting *Wagner v. Campbell*, 779 F.3d 761, 766 (8th Cir. 2015)); *see also Hughes v. Stottlemyre*, 454 F.3d 791, 797 (8th Cir. 2006) ("[N]ot everything that makes an employee unhappy is an actionable adverse action." (quoting *Montandon v. Farmland Indus., Inc.*, 116 F.3d 355, 359 (8th Cir. 1997))). Holman did not suffer a "material employment disadvantage" as a result of the department's internal investigation; the only consequence that he experienced was an oral reprimand. ECF No. 13-1 at 9 (March 29, 2018, oral reprimand). An oral reprimand—without more—is not an adverse action. *See Charleston*, 926 F.3d at 990 ("[A] reprimand constitutes an adverse employment action 'only when the employer

uses it as a basis for changing the terms or conditions of the employee's job for the worse.'" (quoting *Campbell*, 779 F.3d at 767)).

*Second*, the *Brady* investigation that was conducted by the County might have been an adverse action, but the Court has already held that the County and Ketola (in her capacity as County Attorney) are immune from claims related to that investigation. *See* ECF No. 24 ("[T]he Court finds that the doctrine of absolute immunity bars all claims against Carlton County and all claims against Ketola that are based on decisions that she made or actions that she took after she became Carlton County Attorney in January 2019."). Holman does not allege—and the record does not show—that Kolodge or the City participated in, or were in any way responsible for, the *Brady* investigation.

*Third*, Holman's termination was definitely an adverse action, but neither Ketola (in her capacity as a CAB member) nor Kolodge caused that termination, so neither can be held liable for it. Ketola never possessed the power—individually or as a member of CAB—to terminate Holman. *See* ECF No. 53-2 at 31 (Ketola deposition; explaining CAB's role in relation to the police department). And although Kolodge voted to terminate Holman, his vote did not cause Holman's termination. Kolodge provided just one of the four votes to terminate Holman, and there is no allegation (let alone evidence) that the other three council members who voted to terminate Holman were

motivated in any way by his Facebook posts.[5]  An individual member of a decision-making body who acts with an impermissible purpose cannot be held liable for a collective decision if the remainder of the body acted without such a purpose.  *See Watson v. Borough of Susquehanna*, 532 F. App'x 233, 236 (3d Cir. 2013); *Coogan v. Smyers*, 134 F.3d 479, 485 (2d Cir. 1998).

The only party who might be held liable for Holman's termination is the City itself.  Strangely, though, Holman did not plead a First Amendment retaliation claim against the City.  *See* ECF No. 1 at 11 (describing retaliation claim as being between plaintiff and "Individual Defendants").  Even if he had, his claim would be dismissed because there is no evidence that the City fired Holman on account of his Facebook posts.  When the City learned of Holman's Facebook posts, the City decided that his punishment should be limited to an oral reprimand; the City was unwilling even to suspend him, as CAB had asked.  After Ketola designated Holman as a *Brady* officer, the City—acting through Reeves and Palmer—tried to *save* Holman's job by persuading Ketola to change her mind.  *See* ECF No. 13-1 at 39–42 (March 21, 2019, letter from Reeves to Ketola).  Only after the City was unsuccessful did the City terminate Holman.  The record is clear that the City's decision to terminate Holman had nothing to do with his two-year-old Facebook posts and everything to do with the fact that the County

---

[5]The Cloquet City Council voted 4-2 to terminate Holman.  ECF No. 13-2 at 21.

Attorney had just announced that she would not prosecute any case in which he was involved.  *See* ECF No. 13-2 at 14–17, 22 (letters from City to Holman regarding termination); ECF No. 54 (minutes of June 4, 2019, closed Council session discussing Holman's termination).

For these reasons, Holman's First Amendment retaliation claim is dismissed.

### C.  Due Process

Holman also alleges that he was terminated without due process in violation of the Fourteenth Amendment.  To prevail on his procedural-due-process claim, Holman must show two things:

First, Holman must show that he had a protected constitutional interest.  "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property."  *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972).

Second, Holman must show that he was deprived of a protected interest without adequate process.  "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting  *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).  In the government-employment context, this means that, before an employee is terminated, the employee "is entitled to oral or written notice of the charges against him, an

explanation of the employer's evidence, and an opportunity to present his side of the story." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985)*; see also Krentz v. Robertson*, 228 F.3d 897, 903 (8th Cir. 2000).  The adequacy of pre-termination procedures is assessed in light of the nature of any post-termination procedures.  *Krentz*, 228 F.3d at 903 ("robust post-termination proceedings may cure superficial pretermination proceedings") (citing *Loudermill*).

Holman argues—and the Court will assume—that Holman possessed a protected liberty and property interest "in his status as an officer, Sergeant and Detective in the Cloquet Police Department."  ECF No. 57 at 22.  But Holman's procedural-due-process claim nevertheless fails because he received all of the process to which he was entitled. Holman does not dispute that, prior to his termination, City Administrator Reeves sent him a letter in which Reeves explained why he was recommending that Holman be fired.  *See* ECF No. 13-2 at 14–17 (Apr. 2, 2019, letter from Reeves to Holman).  Nor does Holman dispute that he, his attorneys, and his union representative appeared at a hearing before the Cloquet City Council and had the opportunity to explain why Holman should not be fired.  *See id.* at 21 (minutes from June 4, 2019, Council meeting). That would seem to be all that the Fourteenth Amendment requires.

Holman nevertheless argues that the notice and hearing he received were insufficient because "[the notice] presents conclusory statements regarding the reasons

City Administrator Reeves was recommending termination" and "the hearing . . . was meaningless as Plaintiff's termination was a foregone conclusion."  ECF No. 57 at 25–27.  Holman's characterization of Reeves' letter is not accurate; far from being "conclusory," the letter contains four single-spaced pages of explanation for Reeves' decision, ECF No. 13-2 at 14–17, which substantially exceeds the types of explanations that have been held adequate in other cases.[6]  That Holman *disagrees* with Reeves' reasons for recommending termination does not make Reeves' reasons "conclusory."

Moreover, the hearing before the City Council was far from "meaningless."  Holman, his attorneys, and his union representative appeared and had the opportunity to say whatever they wanted on Holman's behalf.  Holman had a chance to meet face-to-face with the decision makers and tell his side of the story.  That is all that the Fourteenth Amendment required.  *Cf. Krentz*, 228 F.3d at 903 (pre-termination hearing satisfied due process—even where board refused to answer employee's questions, did

_____

[6]*See, e.g., Smutka v. City of Hutchinson*, 451 F.3d 522 (8th Cir. 2006) (concluding that one-and-a-half page letter satisfied pre-termination notice requirement); *Larson v. City of Fergus Falls*, 229 F.3d 692 (8th Cir. 2000) (holding that Larson received adequate pre-termination notice where "[h]e knew that [his negative and angry attitude on the job] was the basis for his . . .  suspension" and his supervisor "told Larson he was being terminated for his management style" at a meeting); *Post v. Harper*, 980 F.2d 491 (8th Cir. 1992) (finding that meeting at which parties discussed "all three of the grounds listed in the notice of termination" "was adequate to satisfy due process requirements"); *Franzwa v. City of Hackensack*, 567 F. Supp. 2d 1097 (D. Minn. 2008) (holding that plaintiff was not denied due process even though "he was first presented with the Defendants' assertion . . . a half-hour before the start of that meeting, and was not provided with an opportunity to view the evidence against him").

not record or transcribe the hearing, and refused to let employee's attorney participate in the hearing—because employee had opportunity to address concerns contained in pre-termination letter and robust post-termination process was available).

Holman argues that his due-process rights were violated because there was little chance that he could persuade the City Council not to terminate him after Ketola designated him as a *Brady* officer.  But the fact that Holman was entitled to adequate *process* does not mean that he was entitled to a particular *outcome*.  *See Conopco, Inc. v. Roll Int'l & Paramount Farms, Inc.*, 231 F.3d 82, 88 (2d Cir. 2000) ("It is black-letter law that due process guarantees a fair *hearing*, *not* a legally correct *outcome*." (emphasis in original) (collecting cases)).  As the Court explained at the hearing on the motion to dismiss, Holman's argument is akin to a criminal defendant arguing that his trial was unfair because the evidence against him was so overwhelming that a jury was bound to convict him.  It may have been likely that the City Council was going to terminate Holman, but that is because the City had little use for a detective who could not testify in court, and no amount of notice or hearing would change that fact.  *Cf. Johnstone v. Swenson*, 363 F.2d 643, 646 (8th Cir. 1966) (rejecting due process claim based on ineffective assistance of counsel where "evidence of appellant's guilt was so overwhelming that counsel was hard put as to any strategy, except trying as much as possible to keep the jury from becoming hardened toward appellant").

Finally, it should be noted that Holman, like the plaintiff in *Krentz*, received robust post-termination process.  His termination was fully litigated before an arbitrator, and the arbitrator upheld the City's decision to terminate him.  *See* ECF No. 60-26 (November 7, 2019, Arbitrator's Award).

In short, Holman received all of the process that the Fourteenth Amendment required.  His due process claim is dismissed.

### D.  State-Law Claims

Holman's remaining claims arise under state law.  (Those claims include defamation, intentional infliction of emotional distress, negligent training and supervision, and negligent maintenance of employee personnel file.)  The parties are not diverse, and therefore the Court does not have original jurisdiction over those claims. The Court could exercise supplemental jurisdiction over those claims under 28 U.S.C. § 1367(a), but, because the claims over which the Court has original jurisdiction are being dismissed before trial, the Eighth Circuit requires this Court to decline to exercise supplemental jurisdiction over the remaining state-law claims.  *Hervey v. Cnty. of Koochiching*, 527 F.3d 711, 726–27 (8th Cir. 2008).  Thus, Holman's state-law claims are dismissed without prejudice "so that [they] may be considered, if at all, by the courts of Minnesota."  *Id.* at 726.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED that defendants' motion for summary judgment [ECF No. 50]

is GRANTED.  Plaintiff's federal claims are DISMISSED WITH PREJUDICE AND ON

THE MERITS, and plaintiff's state-law claims are DISMISSED WITHOUT PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  August 16, 2022                               s/Patrick J. Schiltz
                                                      Patrick J. Schiltz, Chief Judge
                                                      United States District Court

-18-